**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CONGRESSWOMAN CORRINE BROWN,
et al.,
                              Plaintiffs,
vs.                                          Case No. 3:12-cv-852-J-99TJC-MCR

KEN DETZNER, etc., et al.,

                              Defendants.
_____

**ORDER**

When it comes to protecting the fundamental right to vote, African Americans have special reason to be vigilant.  Indeed, the Voting Rights Act was passed in 1965 to "banish the blight of racial discrimination in voting."[1]  In this lawsuit, a group of African American leaders and voters, including a member of Congress, claim that 2011 amendments to Florida's early voting law disproportionately and adversely affect African American voters and are therefore not only unlawful under the Voting Rights Act, but also violate the United States Constitution.

All parties agree that there is no fundamental right to an early voting option. Nevertheless, 32 states have some type of early voting.  Florida passed its first early voting law in 2004.  Since 2006, Florida law has provided for up to 14 days of early voting, up through the Sunday before the Tuesday Election Day.  Importantly, however, the law did not require that early voting be held on Sundays (a day that Plaintiffs say is very important to African American voters) and in practice, relatively few Florida counties conducted early

_____

[1]South Carolina v. Katzenbach, 383 U.S. 301, 308 (1966).

voting on Sundays.

By most accounts, Florida's early voting system was working well and over the years early voting became increasingly popular, especially with African American voters. In 2011, the Florida legislature decided to change the early voting law. Of concern to Plaintiffs, the legislature did so without clearly identifying why the law needed to be changed, without creating much of a legislative record to document its reasons for the change, and against the advice of the Florida State Association of Supervisors of Elections, which represents the local supervisors of elections who actually administer the early voting law.

The amended law reduces the number of early voting days from no fewer than 12 to 8, starting with the Saturday ten days before Election Day and ending the Saturday two days before Election Day. During those eight days, local elections supervisors have discretion to offer between 6 and 12 hours of early voting each day. Unlike the old law, which the Plaintiffs are asking the Court to restore, the new law does mandate two Saturdays and one Sunday of early voting, although not the Sunday immediately before Election Day. Also, if local supervisors maximize the number of hours permitted by the new law (as almost all of the large counties in Florida plan to do for the upcoming general election), the total number of early voting hours – 96 – is the same as under the old law. Here is a chart comparing the early voting days and hours under the old and new laws:

|  | Old Law | New Law |
|---|---|---|
| Total Days | 12-14 | 8 |
| Weekend Days | 2 – 4 | 3 |
| Sundays | 0 – 2 | 1 |
| Total Hours | 96 | 48 – 96 |
| Weekend Hours | 16 | 18 – 36 |
| Sunday Hours | 0 – 16 | 6 – 12 |

While federal courts are reluctant to interfere with the enforcement of duly enacted laws of a state, the federal court does have an established and proper role as a guardian of all citizens' right to vote and to ensure that a state's voting laws are not contrary to the Voting Rights Act or the Constitution.  The Court takes this obligation seriously; it has carefully reviewed the law and the record, and conducted a lengthy hearing on September 19, 2012. While acknowledging Plaintiffs' understandable concerns about how the change in the law might impact African American voters, the Court concludes that the new law will not impermissibly burden the ability of African Americans to vote.  Plaintiffs have not shown that they are substantially likely to prevail on their claims that the new early voting law is unlawful under the Voting Rights Act or violates the Constitution.  My reasoning follows.

## I.      Procedural Posture

On July 27, 2012, Plaintiffs[2] initiated this action against Defendants Ken Detzner, in his official capacity as Florida Secretary of State (the Secretary), and Jerry Holland, in his official capacity as Supervisor of Elections for Duval County, Florida (Holland).  In the Complaint (Doc. 1), Plaintiffs allege that certain recent amendments to Section 101.657(d)

_____

[2] Besides Congresswoman Brown, the Plaintiffs are African American leaders and voters, as well as the Southern Christian Leadership Conference Jacksonville Florida Chapter, and the Duval County Democratic Executive Committee.

of the Florida Statutes pertaining to the time period for early voting in Florida, violate both the Florida and the United States Constitutions, as well as Section 2 of the Voting Rights Act (VRA), 42 U.S.C. § 1973(a).  The Republican Parties of Broward, Clay, Sarasota, and Highlands Counties (Intervenor Defendants) have been permitted to intervene.  Clerk's Minutes (Doc. 29); Clerk's Minutes (Doc. 38).  This case is before the Court on Plaintiffs' Motion for Preliminary Injunction (Doc. 15) and Amended Memorandum in Support (Doc. 17; Plaintiffs' Memo), to which the Secretary, Holland, and Intervenor Defendants responded.[3] See Secretary's Response (Doc. 30); Holland's Response (Doc. 28); Response of Broward, Clay and Sarasota Intervenors (Doc. 35; Intervenor Defendants' Response); see also Response of Highlands County Intervenor (Doc. 36, Ex. B).  The Court held a hearing on the Motion for Preliminary Injunction on September 19, 2012, the record of which is incorporated by reference.  Because the early voting period for the November general election is rapidly approaching, and certainty about the early voting law is important for all voters, the Court has expedited its review and decision.

## II.    Background

In 2004, the Florida legislature amended Florida's election laws to allow in-person early voting for the first time in Florida.[4]  See C.S.S.B. 2346, 2004 Fla. Sess. Ch. 2004-252,

---

[3] Although named as a Defendant, Holland "takes no substantive position and has no substantive response as to the merits of Plaintiff's Motion for Preliminary Injunction."  See Holland's Response at 2.

[4] The legislature amended the 2004 version of the Early Voting Statute in 2005.  Initially, Florida law provided that early voting would end "the day before an election."  See Fla. Stat. § 101.657(d) (eff. July 1, 2004 - Dec. 31, 2005).  However, in 2005, the legislature passed
(continued...)

§ 13.   Prior to the amendments at issue in this lawsuit, Florida's "Early Voting Statute"

provided as follows:

> Early voting shall begin on the 15th day before an election and end on the 2nd day before an election. . . . Early voting shall be provided for 8 hours per weekday and 8 hours in the aggregate each weekend at each site during the applicable periods.   Early voting sites shall open no sooner than 7 a.m. and close no later than 7 p.m. on each applicable day.

Fla. Stat. § 101.657(d) (2005 Early Voting Statute).   Thus, the early voting period lasted 12-

14 days, with 96 total hours of early voting, including eight hours of early voting during each

of the two weekends immediately preceding the election.   Id.   The statute provided the

supervisors of elections with discretion to determine whether the eight hours of weekend

voting would take place on a Saturday, a Sunday, or be split between both.   See Florida v.

United States, ___ F. Supp. 2d ___, No. 1:11-cv-1428, 2012 WL 3538298, at *5 (D.D.C. Aug.

16, 2012).

On May 19, 2011, the Governor of Florida signed into law a bill amending several

aspects of Florida's elections laws, including the 2005 Early Voting Statute.   H.B. 1355, 2011

Fla. Sess. Law Serv. Ch. 2011-40 (HB 1355).   This lawsuit pertains solely to the section of

HB 1355 concerning the time period for early voting.   Florida law now provides that:

> Early voting shall begin on the 10th day before an election that contains state

---

[4](...continued)
a bill shortening the early voting period to allow more time between the end of early voting and Election Day because "logistical difficulties and staff fatigue have prompted requests from many supervisors for more time between the end of early voting and Election Day." See House of Representatives Staff Analysis (Doc. 30, App'x V4 at 1438).   As such, the legislature changed the statute to allow early voting to end "on the 2nd day before an election." See Fla. Stat. § 101.657(d) (eff. Jan. 1, 2006 - May 18, 2011) (2005 Early Voting Statute).

5

or federal races and end on the 3rd day before the election, and shall be provided for no less than 6 hours and no more than 12 hours per day at each site during the applicable period.

Fla. Stat. § 101.657(d) (eff. May 19, 2011) (2011 Early Voting Statute).  This amendment eliminates from four up to six[5] days of early voting in Florida, and requires early voting to end on the Saturday before the election.  Id.  As such, supervisors of elections are now prohibited from conducting early voting on the Sunday before Election Day, as was previously allowed, but not required, under the old law.  Id.  In addition, supervisors of elections now have the discretion to allow as little as 48 hours of early voting (six hours a day for eight days), or as much as 96 hours of early voting (12 hours a day for eight days).  Id.

Pursuant to Section 5 of the VRA, 42 U.S.C. § 1973c, five Florida counties[6] must obtain advance approval, or "preclearance" from either the Attorney General or a three-judge district court before administering any new "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting."  42 U.S.C. § 1973c(a); see also Florida, 2012 WL 3538298, at *2.  On August 1, 2011, the State of Florida filed a Complaint in the United States District Court for the District of Columbia seeking judicial preclearance of four of the changes to its voting laws contained in HB 1355, including the early voting amendments at issue in this lawsuit.  See Florida, 2012 WL 3538298, at *3, *5.  On August

---

[5] Because most counties did not utilize the option for Sunday voting under the 2005 Early Voting Statute, for voters in most Florida counties, the new law provides only four fewer days of early voting.  See Affidavit of John O. Boynton, III, Deputy Florida Secretary of State, (Doc. 30, App'x V4 at 1454-55; Boynton Aff.) ¶¶ 5-7.

[6] The five Florida counties subject to the preclearance requirement are Collier, Hardee, Hendry, Hillsborough, and Monroe.  See Florida, 2012 WL 3538298, at *2.

16, 2012, a three-judge district court held, in relevant part:

> [W]e cannot preclear Florida's early voting changes at this time because the State failed to satisfy its burden of proving that those changes will not have a retrogressive effect on minority voters if the covered counties offer only the minimum number of early voting hours required under the new statute, which would constitute only half the hours required under the prior law.  We also conclude, however, that if Florida and the covered counties were to submit a preclearance plan that offered early voting for the maximum number of hours authorized by the new statute, which would be exactly the same number as under the prior law, and did so on a standard 7 a.m. to 7 p.m. schedule, Florida likely would satisfy its burden of proving that the overall effect of its changes in law would be nonretrogressive.

Id. at *47.  Following this decision, the State informed the Florida court that the supervisors of elections in the five covered counties intend to implement a 7 a.m. to 7 p.m. early voting plan with the full 96 hours of early voting, as conditionally approved by the court.  See Florida, No. 1:11-cv-1428, ECF Nos. 158, 159 (filed Sept. 5-6, 2012).  At the direction of the court, Florida then sought Section 5 preclearance of the 7 a.m. to 7 p.m. voting schedule for the five covered counties from the Attorney General, and on September 12, 2012, the Attorney General informed the State that "he would interpose no objection under Section 5 to the submitted set of voting changes."  Plaintiffs' Notice of Filing (Doc. 31).  Thus, "the five covered counties will offer the maximum 96 hours of early voting over an eight-day period, with hours from 7 a.m. to 7 p.m, and that schedule will be the benchmark against which any subsequent early voting changes proposed by the covered counties must be reviewed."  Id.

In this case, Plaintiffs seek a declaratory judgment that the 2011 Early Voting Statute violates both the Florida and the United States Constitutions, as well as Section 2 of the VRA.  See Complaint at 24.  In addition, Plaintiffs seek an injunction prohibiting Defendants from enforcing § 101.657(1)(d), Fla. Stat. (2011) which requires early voting

7

as defined in § 97.021(8), Fla. Stat. (2011) to start on the 10th day prior to Election Day and end on the 3rd day before an election (the "Sunday Voting Ban") and reinstating early voting beginning on the 15th day before election day and ending on the 2d day before an election as required in § 101.657(1)(d), Fla. Stat. (2005).

Plaintiffs' Motion at 1. Plaintiffs "seek this relief in time for the general election to be held on November 6, 2012, and to have it applied throughout the State of Florida or, in the alternative, in Duval County, Florida only." Id. at 1-2. However, at the September 19, 2012 hearing, Plaintiffs clarified that this lawsuit does encompass the entire State of Florida, and is not limited to Duval County only.[7]

## III.    Standard Governing Preliminary Injunctions

A court may grant a preliminary injunction if the moving party establishes:

"(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest."

Ga. Latino Alliance for Human Rights v. Gov. of Ga., ___ F.3d ___, 2012 WL 3553612, at *7 (11th Cir. Aug. 20, 2012) (quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998)). The Eleventh Circuit instructs that "'[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to the four requisites.'" McDonald's Corp., 147 F.3d at 1306 (quoting All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc., 887 F.2d 1535, 1537

---

[7] The Secretary objects to this because Plaintiffs have not joined all of the other supervisors of elections (besides Duval County's) as defendants. At the preliminary injunction stage, the Court has not reached this issue.

8

(11th Cir. 1989)).  Moreover,

> "preliminary injunctions of legislative enactments – because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits – must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts."

United States v. Alabama, 443 F. App'x 411, 420 (11th Cir. 2011) (quoting Ne. Fla. Chapter

of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir.

1990)).

## IV.    Discussion[8]

"No right is more precious in a free country than that of having a voice in the election

---

[8] The Secretary as well as the Intervenor Defendants assert that Plaintiffs' Motion is due to be denied on the basis of laches.  The Secretary and Intervenor Defendants argue that Plaintiffs caused inexcusable delay by waiting over a year after HB 1355 was enacted to file this lawsuit.  Indeed, although HB 1355 was signed into law on May 19, 2011, Plaintiffs did not initiate this action until July 27, 2012.  A movant may be barred by laches from preliminary injunctive relief in a voting rights case where a defendant establishes that the moving party "unreasonably delayed in asserting their rights and that such delay prejudiced" the defendant.  Miller v. Bd. of Com'rs of Miller County, 45 F. Supp. 2d 1369, 1373 (M.D. Ga. 1998); see also United States v. Barfield, 396 F.3d 1144, 1150 (11th Cir. 2005) (explaining that to prove laches a defendant must show inexcusable delay and undue prejudice).  Here, the Secretary maintains that the staff of both the county elections supervisors and the Secretary of State have been readying for the election based upon the current early voting timeline.  Secretary's Response at 29.  Intervenor Defendants explain that they would be prejudiced by the issuance of the requested injunction because they "have already made critical decisions and expended significant resources planning for the general election based on the existing early voting schedule" and "[an extension of] the early voting period would result in unexpected resource allocation and expenditures for which Intervenor-Defendants have not planned or budgeted."  Intervenor Defendants' Response at 8.  While the Court acknowledges that these harms are not insubstantial, and that there was delay in the filing of this lawsuit, Plaintiffs' reason for the delay, as discussed at the hearing, seems plausible; moreover, the potential prejudice to the Secretary, the Intervenor Defendants, or the constituents they represent, is not sufficient to warrant denying injunctive relief solely on this basis.  Accordingly, the Court will consider this matter on its merits.

of those who make the laws under which, as good citizens, we must live." <u>Wesberry v. Sanders</u>, 376 U.S. 1, 17 (1964).  Indeed, the Eleventh Circuit has referred to voting as "about the most important thing there is." <u>Citizens for Police Accountability Political Comm. v. Browning</u>, 572 F.3d 1213, 1221 (11th Cir. 2009).  Thus, the Court carefully considers this case with the understanding that the right to vote is a "fundamental matter in a free and democratic society.  Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the rights of citizens to vote must be carefully and meticulously scrutinized." <u>Reynolds v. Sims</u>, 377 U.S. 533, 561-62 (1964).

### A.    Substantial Likelihood of Success[9]

#### i.    Voting Rights Act - Section 2

Plaintiffs maintain that the 2011 changes to the Early Voting Statute implemented by HB 1355 result in "a new early voting scheme that has the effect of denying African American voters, a protected minority, an equal chance to participate in the electoral process," in violation of Section 2 of the VRA.  Plaintiffs' Memo at 23, 26.  In his Response, the Secretary maintains that Plaintiffs cannot demonstrate a violation of Section 2 for several reasons.  Secretary's Response at 10-20.

Section 2 of the VRA "was designed as a means of eradicating voting practices that minimize or cancel out the voting strength and political effectiveness of minority groups."

---

[9] Plaintiffs' Motion is premised on their claims under Section 2 of the VRA and the Fourteenth and Fifteenth Amendments to the federal constitution.  <u>See</u> Plaintiffs' Memo at 22-30.  Accordingly, the Court will not address Plaintiffs' cause of action under the Florida Constitution or their First Amendment claim.  <u>See</u> Complaint at 13, 22-24.

10

Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 479 (1997) (internal quotations omitted).  As

such, the Supreme Court instructs that the VRA "should be interpreted in a manner that

provides the broadest possible scope in combating racial discrimination."   Chisom v.

Roemer, 501 U.S. 380, 403 (1991) (internal quotations omitted).  Significantly, "[i]n 1982,

Congress amended section 2 to clarify that a plaintiff may establish a violation by a showing

of discriminatory results alone." Burton v. City of Belle Glade, 178 F.3d 1175, 1196 (11th Cir.

1999).[10]  Thus, as amended, Section 2 of the VRA provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or
> procedure shall be imposed or applied by any State or political subdivision in
> a manner which results in a denial or abridgement of the right of any citizen of
> the United States to vote on account of race or color . . . .

42 U.S.C. § 1973(a).[11]  According to the statute, a violation of Section 2 is established if:

> based on the totality of the circumstances, it is shown that the political
> processes leading to nomination or election in the State or political subdivision
> are not equally open to participation by members of [the protected class] in
> that its members have less opportunity than other members of the electorate
> to participate in the political process and to elect representatives of their
> choice.

42 U.S.C. § 1973(b).  The question of whether "political processes" are "equally open"

depends on "a searching practical evaluation of the past and present reality, and on a

---

[10] Under the prior version of the law, the Supreme Court held in City of Mobile, Ala. v.
Bolden, 446 U.S. 55 (1980) that to establish a violation of the VRA a plaintiff must prove
purposeful discrimination.  See Bolden, 446 U.S. at 60-62.  In response to this decision,
Congress amended the VRA in 1982 to eliminate this "intent" requirement and "make clear
that a violation could be proved by showing discriminatory effect alone . . . ." See Thornburg
v. Gingles, 478 U.S. 30, 35 (1986).

[11] The terms "vote" or "voting" include "all action necessary to make a vote effective in any
primary, special, or general election, including, but not limited to . . . casting a ballot . . . ."
See 42 U.S.C. § 1973l(c)(1).

functional view of the political process." <u>Gingles</u>, 478 U.S. at 45 (internal quotations omitted).  Indeed, "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." <u>Id.</u> at 47.

The Eleventh Circuit explains that "a plaintiff must prove invidious discrimination in order to establish a violation of section 2 of the Voting Rights Act." <u>Nipper v. Smith</u>, 39 F.3d 1494, 1524 (11th Cir. 1994); <u>see</u> also <u>Osburn v. Cox</u>, 369 F.3d 1283, 1289 (11th Cir. 2004). Accordingly, to prove a violation of Section 2, a plaintiff must demonstrate either:

> (1) discriminatory intent on the part of legislators or other officials responsible for creating or maintaining the challenged system; <u>or</u> (2) objective factors that, under the totality of the circumstances, show the exclusion of the minority group from meaningful access to the political process due to the interaction of racial bias in the community with the challenged voting scheme.

<u>Nipper</u>, 39 F.3d at 1524; <u>see</u> also <u>Osburn</u>, 369 F.3d at 1289.   The Eleventh Circuit recognizes "two distinct types of discriminatory practices and procedures [that] are covered under section 2: those that result in 'vote denial' and those that result in 'vote dilution.'" <u>Burton</u>, 178 F.3d at 1196.  "Vote denial occurs when a state employs a 'standard, practice, or procedure' that results in the denial of the right to vote on account of race." <u>Johnson v. Gov. of Fla.</u>, 405 F.3d 1214, 1227 n.26 (11th Cir. 2005).[12]  This case raises a "vote denial"

---

[12] "In contrast, vote dilution occurs when an election practice results in the dilution of minority voting strength and, thus, impairs a minority's ability to elect the representative of its choice." <u>Burton</u>, 178 F.3d at 1198.  Notably, "section 2 from 1982 onward ha[s] been used almost entirely for vote dilution claims." <u>Simmons v. Galvin</u>, 575 F.3d 24, 42 n.24 (1st Cir. 2009) (internal quotations and alterations omitted).

claim.[13]  See Plaintiffs' Memo at 25.

---

[13] In evaluating the "totality of the circumstances," the Supreme Court notes the following "typical factors" which may be probative of a Section 2 violation:

> 1.  "the history of voting-related discrimination in the State or political subdivision;
>
> 2.  "the extent to which voting in the elections of the State or political subdivision is racially polarized;"
>
> 3.  "the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;"
>
> 4. "the exclusion of members of the minority group from candidate slating processes;"
>
> 5. "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political processes;"
>
> 6.  "the use of overt or subtle racial appeals in political campaigns;"
>
> 7. "the extent to which members of the minority group have been elected to public office in the jurisdiction;"
>
> 8. "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;" and
>
> 9. "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

Gingles, 478 U.S. at 37, 44-45 (citing the Senate Judiciary Committee Majority Report (Senate Report) accompanying the bill that amended Section 2, S. Rep. No. 97-417, 97th Cong. 2nd Sess. 28 (1982), U.S. Code Cong. & Admin. News 1982); see also Nipper, 39 F.3d at 1511.  These factors are neither comprehensive, nor exclusive, such that courts may consider other relevant factors.  See Gingles, 478 U.S. at 45.  Notably, it appears that these factors were developed in the context of vote dilution rather than vote denial claims.  See Gingles, 478 U.S. at 45; White v. Regester, 412 U.S. 755 (1973); Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir. 1973) (en banc).  However, at least one court has applied them in the vote denial context.  See Miss. State Chapter, Operation Push v. Allain, 674 F. Supp. 1245, 1263-66 (N.D. Miss. 1987).  In this case, neither party addresses the Gingles factors in the briefs, and given the context of this case, the Court finds the factors to be of limited usefulness.  Accordingly, although the Court considers Plaintiffs' VRA claim under the totality of the circumstances, the Court will not specifically address the Gingles factors.

### 1.   Discriminatory Intent

The Court will first consider whether Plaintiffs can establish a substantial likelihood of success on their Section 2 claim by demonstrating that the changes to Florida's Early Voting Statute were made with discriminatory intent.  "Discriminatory purpose may be established by proof that the [legislature] used race as a substantial or motivating factor" in its decision to amend Florida's Early Voting Statute.  Burton, 178 F.3d at 1189.  In making this determination, the Court considers "all available direct and circumstantial evidence of intent."  See id.  In Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977), the Supreme Court set forth the following relevant evidentiary factors: (1) whether the law has a disproportionate impact on a particular group; (2) "[t]he historical background of the decision"; (3) "[t]he specific sequence of events leading up to the challenged decision," including whether the decision was a "[d]eparture[ ] from the normal procedural sequence" or "if factors usually considered important . . . [would] strongly favor" a contrary decision; and (4) the legislative history of the decision, especially "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." Id. at 266-68.

As to the first factor, the Supreme Court states that "[t]he impact of the official action whether it 'bears more heavily on one race than another,' may provide an important starting point."  See id. at 266 (quoting Washington v. Davis, 426 U.S. 229, 242 (1976)) (internal citations omitted).  As discussed further below, the Court finds that the amendments to the Early Voting Statute will have a disproportionate effect on minority voters because minority voters disproportionately use early voting.  See infra pp. 24-25.  However, as the Florida

14

court observed, to the extent the counties implement hours that will not result in retrogression, i.e., the full 96-hour voting plan available under the new law, "that will be a significant factor in favor of a finding of nondiscriminatory purpose." Florida, 2012 WL 3538298, at *41. Because, as addressed in the next section, the evidence before the Court does not demonstrate that the changes will deny minorities equal access to the polls, the otherwise disproportionate effect of the amendments does not weigh heavily in favor of finding discriminatory purpose. See infra Part IV.A.i.2.

Turning to the second factor, the Supreme Court instructs that "[t]he historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." See Arlington Heights, 429 U.S. at 267. Plaintiffs appear to address this factor by arguing that early voting was initially adopted in Florida as a response to the 2000 election, where a disproportionate percentage of African American voters were disenfranchised. See Plaintiffs' Memo at 4-6. However, Plaintiffs provide the Court with no evidence to suggest that the problems arising in the 2000 election were caused by a discriminatory intent on behalf of government officials. See Duval County Election Reform Task Force - Final Report June 12, 2001 (Doc. 17, Ex. C) at 6 ("The Task Force found, however, no evidence of conspiracy or intentional wrongdoing."); see also Jacksonville Coal. for Voter Prot. v. Hood, 351 F. Supp. 2d 1326, 1333-34 (M.D. Fla. 2004). Thus, as in Hood, the Court simply cannot extrapolate from that event a discriminatory intent in this case. See Hood, 351 F. Supp. 2d at 1333.

With respect to the third factor, Plaintiffs contend that irregularities in the legislative procedures leading to the adoption of the amendment demonstrate a discriminatory intent.

15

Specifically, Plaintiffs rely on the Affidavit of Ion V. Sancho, Supervisor of Elections for Leon County (Doc. 17, Ex. E; Sancho Aff.), and the Deposition of David Stafford, Supervisor of Elections for Escambia County and President of the Florida State Association of Supervisiors of Elections (Doc. 17, Ex. F; Stafford Dep.).  Mr. Sancho refers to the "very uncommon" three-minute limit on public comment during the April 26, 2011 Senate Budget Committee Hearing on HB 1355, Sancho Aff. ¶¶ 8-9, and Mr. Stafford states that it was "unusual" that the amendments were effective immediately, rather than at some point after enactment. Stafford Dep. at A5134-35.  In addition, Plaintiffs also cite to the use of a "strike-all" amendment to introduce these changes the day before the amendment was taken up by the Senate Rules Committee, such that there was less time to analyze and prepare comments regarding the proposed changes. See Plaintiffs' Memo at 7 n.3; Stafford Dep. at A5085-86.

The Court finds, however, that this evidence is not sufficient to demonstrate that the sequence of events leading up to the early voting changes was particularly unusual.  Indeed, the Florida court considered largely the same evidence in its analysis of the legislative purpose behind HB 1355 in the context of changes to the inter-county mover laws.  See Florida, 2012 WL 3538298, at *72-74.  Upon a more complete record, and with substantially more time to consider that record, the Florida court found that:

> The bills that ultimately became HB 1355 were amended several times during the legislative process, often by means of 'strike-all' amendments.  But several witnesses who are familiar with the standard procedures in the Florida legislature testified that such strike-all amendments are not necessarily unusual in Florida.  In addition, the record of the debates on HB 1355 reveals that the legislative process unfolded over a period of several months, and involved substantial testimony from a number of Florida election officials and members of the general public.  The record contains several examples of Florida voting laws passed in recent years that were enacted to take

16

immediate effect.

Id. at *73-74 (internal citations omitted).  The Florida court concluded that "[b]ased on the record before us . . . we are simply unable to determine whether the legislative process was unusual."   Id. at *46.   This Court finds no evidence in the record before it (which is substantially the same as the record before the Florida court) to support a departure from those findings, nor are the differences between the legislative process regarding the inter-county mover changes and the early voting changes, both part of HB 1355, sufficient to suggest that the Florida court's findings in this respect are not applicable here.   While agreeing that the legislative record regarding the reasons for the early voting changes is somewhat meager, this is not enough to support a finding of discriminatory intent.

Next, the Court considers the legislative history of the decision, especially "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  Arlington Heights, 429 U.S. at 266-68.  Plaintiffs rely on State Senator Mike Bennett's statement during the Senate floor debate that "he did not want to make it easier for people to vote, but rather that it should be harder to vote–as it is 'in Africa.'"  See Florida, 2012 WL 3238298, at *44 & n.66 (setting forth Senator Bennett's statement in full).  Plaintiffs contend that this contemporaneous statement by a member of the legislative body reflects discriminatory intent.  See Plaintiffs' Memo at 29.  The Florida court also reviewed Senator Bennett's statement, and reasoned that "[w]hether or not Senator Bennett actually intended his statement to have racial undertones, it certainly can be read that way.  Hence, Senator Bennett's remarks could be considered evidence of discriminatory purpose."  Florida, 2012 WL 3238298, at *44.  However, the Florida court found that Senator Bennett's is the only

17

statement suggesting a discriminatory purpose on the part of the Florida legislature, and that Senator Bennett "was neither a sponsor nor a primary proponent of HB 1355, and did not play an important role in passage of the bill." Id. The Florida court observes that "although Senator Bennett was the Senate President Pro Tempore at the time, that office has limited authority, and there is no evidence it played any role in passage of the amendments." Id. As such, the Florida court concluded that "Senator Bennett's single statement is not enough to suggest that his purpose, whatever it was, represented the purpose of the Florida legislature as a whole.  Accordingly, . . . the 'contemporaneous statements' factor does not materially weigh in favor of a finding of discriminatory purpose." Id. at 45.  This Court finds no reason in the record here to depart from the Florida court's analysis.

Moreover, this Court also considers the Secretary's evidence of contemporaneous statements by legislators suggesting that the early voting amendments were intended to increase flexibility and make the early voting process more efficient.  See Secretary's Response at 7-8.  For example, State Representative Joseph A. Gibbons stated that "we are just simply trying to make it so that the local Supervisor[s] of Elections who know their communities have some flexibility when setting early voting hours."  See April 20, 2011 House Floor Sess. Tr. (Doc. 30, App'x V4 at 1416).  The Secretary argues that the amendments reflect a "compromise" in reducing the number of days of early voting, but granting greater flexibility with respect to hours.  See May 4, 2011 Senate Floor Sess. Tr. (Doc. 30, App'x V4 at 1418-21).

Plaintiffs also submit the testimony from two supervisors of elections who contend that, contrary to the position of the legislators, the changes to early voting will not actually

18

save money, and may in fact increase the cost of early voting. <u>See</u> Sancho Aff. ¶ 12; Stafford Dep. at A5060. In addition, Plaintiffs rely on the Florida State Association of Supervisors of Elections' submission to the Florida Senate regarding these changes which states that the supervisors believe a 15-day time period is "imperative" to a smooth general election and "best serves the voting public." <u>See</u> Plaintiffs' Memo, Exs. H and I. Plaintiffs also provide evidence that the Florida legislature did not conduct any study or analysis of the effect these changes would have prior to amending the statute. <u>See</u> Plaintiffs' Memo, Ex. J at A7069. The Court has considered this evidence, and while the failure of the legislature to study more fully the impact of the changes is concerning, in light of all the evidence, the Court cannot conclude that it warrants a finding of discriminatory intent. <u>See</u> <u>Florida State Conference of NAACP v. Browning</u>, 569 F. Supp. 2d 1237, 1251 (N.D. Fla. 2008) ("It is well established that, in the election context, there is no need for an 'elaborate, empirical verification of the weightiness of the State's asserted justifications.'" (quoting <u>Timmons v. Twin Cities Area New Party</u>, 520 U.S. 351, 364 (1997))). Accordingly, the undersigned agrees with the <u>Florida</u> court that the evidence regarding the legislative process and contemporaneous statements of the legislators do not support a finding of discriminatory purpose.

Finally, Plaintiffs also submit excerpts from a deposition of James A. Greer, former chairman of the Republican Party of Florida, taken in an unrelated case. Deposition of James Greer (Doc. 17, Ex. L; Greer Dep.). In these excerpts, Mr. Greer states that, while he was the chairman of the Republican Party, he was part of a meeting in which "not letting blacks vote" and "suppressing black voters in Florida" was discussed. Greer Dep. at 369,

19

387. He also refers to a meeting where unidentified members of the "House and Senate" were discussing "ways to restrict voters from voting." Id. at 609. The Court is deeply troubled by this testimony and its implications. However, given the limited portion of the deposition included in Plaintiffs' exhibit, the Court is unable to discern the context or time frame in which these matters were allegedly discussed. Moreover, the record contains no evidence connecting these statements to HB 1355 generally, or the amendments to the Early Voting Statute specifically. Without further development of these allegations made by Mr. Greer or how they might relate to the enactment of the 2011 Early Voting Statute, Mr. Greer's testimony cannot serve as evidence of discriminatory purpose in its passage.

Even considering the entire record in the aggregate, the Court finds that Plaintiffs have failed to demonstrate a substantial likelihood of success on their claim that the amendments to Florida's Early Voting Statute were made with the intent to discriminate against African American voters. However, because a Section 2 violation can be proven in an alternative way, this finding is not fatal to Plaintiffs' VRA claim.

### 2.    The "Results" Test

The Court will next consider whether Plaintiffs have demonstrated that application of the 2011 Early Voting Statute in Florida will "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." See 42 U.S.C. § 1973(a). While it is well-settled that a plaintiff need not prove discriminatory intent to establish a Section 2 violation, Johnson, 405 F.3d at 1227, the question remains as to whether a claim of disparate impact alone is sufficient to state a vote denial claim under Section 2. See Simmons, 575 F.3d at 35 & n.10 ("Whether a claim of mere disproportionality

20

alone supports a 'resulting' claim is not clear under § 2 and is a difficult question we need not reach."); Johnson, 405 F.3d at 1229 n.30 ("[T]he deep division among eminent judicial minds on this issue demonstrates that the text of Section 2 is unclear.").  However, despite this lack of clarity, it appears that in the Eleventh Circuit a plaintiff must demonstrate something more than disproportionate impact to establish a Section 2 violation.  See Johnson, 405 F.3d at 1228 ("Despite its broad language, Section 2 does not prohibit all voting restrictions that may have a racially disproportionate effect."); see also id. at 1237-38 (Tjoflat, J., specially concurring, joined by Pryor, J.); Osburn, 369 F.3d at 1289; Nipper, 39 F.3d at 1515.[14]  Moreover, as previously noted, present-day "vote denial" cases are uncommon, and as such, courts have yet to develop a clear analytical framework for this type of case, unlike the more common vote dilution claim.  See Simmons, 575 F.3d at 42 n.24 (citing commentary that "[w]hile Gingles and its progeny have generated a well-established standard for vote dilution, a satisfactory test for vote denial cases under Section 2 has yet to emerge . . . [and] the Supreme Court's seminal opinion in Gingles . . . is of little use in vote denial cases" (internal quotations omitted)).  Nonetheless, the Court will apply the standard articulated by the Eleventh Circuit and consider whether, based on an objective

---

[14] Notably, several courts outside the Eleventh Circuit have also found that a mere showing of disproportionate impact is not sufficient to demonstrate a Section 2 violation.  See Gonzalez v. Arizona, 677 F.3d 383, 405 (9th Cir. 2012) ("[A] § 2 challenge 'based purely on a showing of some relevant statistical disparity between minorities and whites,' without any evidence that the challenged voting qualification causes that disparity, will be rejected."); Wesley v. Collins, 791 F.2d 1255, 1260-61 (6th Cir. 1986) ("[A] showing of disproportionate racial impact alone does not establish a per se violation of the Voting Rights Act."); Smith v. Salt River Project Ag. Improvement & Power Dist., 109 F.3d 586, 595 (9th Cir. 1997); Ortiz v. City of Philadelphia Office of the City Comm'rs Voter Registration Div., 28 F.3d 306, 312 (3d Cir. 1994).

analysis of the totality of the circumstances, the application of the 2011 Early Voting Statute in Florida will act to exclude African American voters from "meaningful access" to the polls, on account of race. See Osburn, 369 F.3d at 1289; Hood, 351 F. Supp. 2d at 1333, 1335.

Both parties rely heavily on the findings of the Florida court; thus, the Court will first consider the extent to which that court's decision informs the analysis here.  In Florida, the question before the three-judge panel under Section 5 of the VRA was "simply whether the burdens [imposed by the new law] are sufficiently material to result in retrogression with respect to minority voters' exercise of their voting rights."  Florida, 2012 WL 3538298 at *14. In the absence of any evidence to the contrary, and given that the burden was on Florida to establish nonretrogression, the Florida court proceeded "on the assumption that the counties will utilize the minimum rather than the maximum permitted hours" of early voting.  Id. at *23. Therefore, the court considered whether the State could prove that "the changes will be nonretrogressive if the covered counties offer only the minimum number of early voting hours that they are required to offer under the new statute, which would constitute only half the hours required under the prior law."  Id. at *2.  After analyzing how the changes to Florida's Early Voting Statute would impact African American voters, in comparison to the prior early voting law, the court concluded that:

> at least one permutation of the early voting changes would result in retrogression.  In particular, we conclude that Florida has failed to meet its burden of showing that retrogression would not occur if the covered counties not only reduced the number of early voting days from 12 to 8 as required by the new law, but also reduced their total early voting hours from 96 to 48 (regardless of the specific hours chosen).

Id. at *17 (emphasis added).  However, the Florida court then found that if the counties were

to utilize the maximum number of early voting hours (96), on a standard 7 a.m. to 7 p.m. schedule, "<u>the negative effect of reducing the number of days from 12 to 8 would likely be</u> <u>offset by the ameliorative effects of adding non-working weekday hours, a Sunday, and</u> <u>additional weekend hours.</u>" <u>Id.</u> at *27-30 (emphasis added).  Finally, the <u>Florida</u> court cautioned that "[w]e do not, however, reach any conclusions about other permutations of early voting hours that the covered counties might offer." <u>Id.</u> at *30.

In contrast, here Plaintiffs, not the State, bear the burden of proof and must establish that the 2011 Early Voting Statute denies African Americans equal access to the political process "on account of race."  The Court need not assume that the minimum number of hours will be implemented by the supervisors of elections, and indeed, Plaintiffs have provided the Court with no evidence to suggest that any supervisor would elect such a plan. Rather, based on the Notice of County Early Voting Plans[15] (Doc. 33), 27 of the 62 non-covered counties will allow the maximum number of early voting hours.  Thus, when the five precleared counties are factored in, 32 of Florida's 67 counties will offer the maximum number of early voting hours available under Florida law, including Duval, Miami-Dade, Hillsborough, Orange, Pinellas, Palm Beach, Broward, Escambia, and Leon Counties, as well as most of Florida's other most populous counties.  Of those counties not offering the full 96 hours, seven of them plan to offer 80 or more hours of early voting, and not one county has announced plans to offer the 48-hour minimum.  Indeed, the fewest hours of early voting currently scheduled is 58 hours in three smaller counties, and those three

---

[15] The Court attaches this Notice (Doc. 33) as an exhibit to this Order.

counties are the only ones with plans to offer less than 60 hours of early voting.

Moreover, in contrast to the Section 5 case before the Florida court, this Court, as Plaintiffs conceded at the hearing, is not conducting a "retrogression" analysis, meaning, this Court is not comparing the new statute against the old to determine whether these voting changes will "'worsen the position of minority voters' in comparison to the preexisting voting standard, practice, or procedure." See Florida, 2012 WL 3538298, at *15 (quoting Reno v. Bossier Parish Sch. Bd., 528 U.S. 320, 324 (2000) superseded on other grounds by 42 U.S.C. § 1973c(c)). Rather, the task before this Court under Section 2 of the VRA is to conduct a "practical evaluation of the 'past and present reality'" to determine whether, under the totality of the circumstances, application of the 2011 Early Voting Statute serves to deny African American voters equal access to the political process. See Gingles, 478 U.S. at 45; 42 U.S.C. § 1973(b); see also Harris v. Graddick, 593 F. Supp. 128, 132 (M.D. Ala. 1984) ("In short, section 2 is violated if the result of a practice is that minority voters cannot participate in the electoral process on the same terms and to the same extent as non-minority voters."). The important distinction between a Section 5 and a Section 2 claim plays a significant role in the Court's decision in this case.

First, Plaintiffs argue that the 2011 Early Voting Statute disproportionately and adversely affects minority voters. In support, Plaintiffs submit the Expert Report of Professor Paul Gronke, Ph.D. (Doc. 17, Ex. B; Prof. Gronke Expert Report ), the Declaration of Professor Daniel A. Smith, Ph.D. (Doc. 17, Ex. N; Prof. Smith Decl.), and the Declaration of Professor Charles Stewart, III, Ph.D. (Doc. 17, Ex. O; Prof. Stewart Decl.). Professors Gronke and Stewart also provided expert reports in the Florida case. See Florida, 2012

24

3538298, at *17-18.   Upon consideration of this evidence, the <u>Florida</u> court found that "minority voters will be disproportionately affected by the changes in early voting procedures because they disproportionately use early in-person voting." <u>Id.</u> at *17.  Although the <u>Florida</u> court was specifically concerned with minority voting in the five covered counties, the court made this finding with respect to the state as a whole.  <u>Id.</u>  Upon review of the evidence before this Court, the undersigned finds no reason to depart from the findings of the <u>Florida</u> court in this respect, and Defendants have presented the Court with no evidence to undermine those findings.   Accordingly, the Court accepts that the changes to the early voting laws disproportionately affect minority voters because minority voters disproportionately use early voting.  <u>Id.</u>

Second, Plaintiffs contend that not only does HB 1355 disproportionately affect minority voters, but that the elimination of the days of early voting that were disproportionately used by minority voters, i.e., the first week of early voting and the Sunday before the election, "has the effect of denying African American voters, a protected minority, an equal chance to participate in the electoral process."  Plaintiffs' Memo at 26.  Plaintiffs rely on the aforementioned expert reports, two of which were also before the <u>Florida</u> court.  In addition, Plaintiffs provide evidence that the changes to the early voting laws will cause longer lines, crowding, and confusion at the polls, which will in turn discourage some reasonable minority voters from waiting to cast their ballots.  <u>See</u> Plaintiffs' Memo at 19, Ex. S ¶ 19.  Because the <u>Florida</u> court discussed this evidence at length, the Court need not

recite it here.[16]  See Florida, 2012 WL 3538298, at *23-26.  In response, the Secretary argues that these changes will not deny minorities meaningful access to the ballot and, in support, submit the Affidavit of John O. Boynton, III, Deputy Florida Secretary of State (Doc. 30, App'x V4 at 1454-55; Boynton Aff.) who states that "[a]t the primary election on August 14, 2012, with [the 2011 Early Voting Statute in effect], the number of early voters was about 52 percent higher than the number of early voters in the last presidential-primary election in August 2008."  See Boynton Aff. ¶ 8.

Upon review of this evidence, the Court does not disagree with the Florida court's conclusion that if Florida counties "offer only 48 hours of early voting (i.e., only 6 hours per day) as the new law permits," that change could impose a material burden on "African-American voters' effective exercise of the electoral franchise."  See Florida, 2012 WL 3538298, at *23.  However, those are not the circumstances before this Court in considering this Motion for Preliminary Injunction; rather, this Court must consider whether under the totality of the circumstances the 2011 Early Voting Statute denies African American voters

---

[16] Professor Smith's affidavit was not submitted in the Florida case, and his analysis is focused generally on Duval County.  Nonetheless, his findings are consistent with those of Professor Gronke, and therefore do not require separate analysis.  See Prof. Smith Decl. ¶ 15 (finding that "there is a strong likelihood that the enforcement of H.B. 1355 – particularly truncating the early voting period from two weeks to eight days, including the elimination of the final Sunday before the election– will negatively affect the ability of African Americans [in Duval County] to turn out to vote").

Plaintiffs also submit several affidavits from African American registered voters in Duval and Hillsborough Counties in which the affiants state that the changes will negatively impact their ability to vote, as well as their efforts to help other minorities vote.  See Plaintiffs' Memo, Exs. S - FF.  The Court notes that the affiants do not discuss how Duval County's announced 96-hour voting schedule will affect them, presumably because the information was not yet available.

equal access to the polls in the upcoming general election. This analysis includes consideration of the ameliorative effects of the amendments. As the <u>Florida</u> court recognized, while it is possible that "the reduction in days–considered alone– would make it more difficult for some voters to get to the polls," <u>id.</u> at *27, the 2011 Early Voting Statute did more than simply cut the number of early voting days. <u>Id.</u> The new law allows supervisors to <u>increase</u> the number of voting hours in a day from 8 to 12, thereby providing more "morning and evening hours that the record suggests would be most convenient for weekday voters" and "more extended [hours] than those offered in any recent election." <u>Id.</u> at *27. Because many supervisors, especially those in larger counties, are implementing a 7 a.m. to 7 p.m., or 8 a.m. to 8 p.m., schedule for the upcoming November election, most minority voters in Florida will likely have access to before and after work hours during the weekday.[17]

Moreover, "the new early voting statute <u>requires</u> the covered counties to offer early voting for at least six hours on the Sunday nine days before Election Day." <u>Id.</u> at *28. While Plaintiffs are concerned about the loss of the Sunday immediately preceding the election, Sunday voting, merely optional under the old law, was not available to voters in most counties in Florida prior to the 2011 amendments. <u>See</u> Boynton Aff. ¶ 5 ("At the 2008 primary and general elections, only 12 of 67 counties offered Sunday early voting, and, of

---

[17] Indeed, even in some counties where the supervisors have elected not to implement the full 96 hours of early voting, voters will nevertheless have access to the 7 a.m. to 7 p.m. schedule during the weekdays, with a more abbreviated schedule on the weekends. <u>See</u> Notice of County Early Voting Plans (Doc. 33) (Gilchrest, Manatee, Marion, and Osceola Counties).

these, only six offered early voting on the last Sunday before the election."); <u>see</u> <u>id.</u> ¶ 7 ("At the 2010 general election, 15 of 67 counties offered Sunday early voting, and, of these, only ten offered early voting on the last Sunday before the election.").  As such, considering the state as a whole, the new statute will actually serve to <u>increase</u> the availability of Sunday voting, the very day Plaintiffs say is most important to African American voters.  Notably, the <u>Florida</u> court rejected the argument that "it is the Sunday immediately before Election Day that is particularly important," and found instead that "there is evidence in the record to suggest that opening the polls on the previous Sunday would also facilitate voting by African-American voters."  <u>See</u> <u>Florida</u>, 2012 WL 3538298, at *28.  The evidence here does not persuade this Court otherwise.[18]

Additionally, the new law will allow supervisors to increase the overall number of weekend voting hours on both weekends preceding the election.  If the maximum number of hours are allowed, "[t]he total would then be 36 weekend hours of early voting (12 hours on each of 3 weekend days), for a net gain of 20 more weekend hours of early voting than under the [old law]."  <u>Florida</u>, 2012 WL 3538298, at *29.  However, even if the supervisors elected to provide the minimum amount of weekend voting, this would still result in 18 weekend voting hours (as opposed to 16 previously), including six mandatory hours of

_____

[18] In this respect, the Court questions whether the remedy Plaintiffs seek, reinstatement of the prior law, would remedy the alleged harm.  Plaintiffs rely heavily on the purported injury from the loss of early voting on the Sunday before the election; however reinstatement of the old law would not ensure that such Sunday voting would be available.  Supervisors of elections would remain free to choose not to implement any Sunday voting at all, as most did under the old law.

Sunday voting.[19]  The <u>Florida</u> court recognized the significance of weekend hours, relying on the testimony of Florida election officials that "based on their experience, . . . expanded weekend hours would provide increased accessibility for many minority voters." <u>Id.</u>  Thus, the Court is unconvinced that the loss of an optional Sunday, that few counties used, outweighs the gain of expanded weekend voting hours, including a mandatory Sunday.

In addition, the <u>Florida</u> court found that "many of the concerns . . . with a contraction of the early voting period to only 48 hours are not likely to materialize (certainly not to the same extent) if the full 96 hours of early voting are maintained on a standard 7 a.m. to 7 p.m. schedule." <u>Id.</u>  Despite the testimony of representatives and volunteers from minority voting rights groups that the two-week period has been essential to coordinating the logistics of Get Out The Vote efforts (GOTV), the <u>Florida</u> court found that:

> the record evidence suggests that GOTV groups could adjust to a redistribution of the total 96 hours over a different number of days, including weekend days and a 'souls-to-the-polls' Sunday. . . . Expanding convenient non-working weekday and weekend voting hours should . . . help third-party efforts to provide transportation to the polls for such voters.

<u>Id.</u>  The court also concluded that the concerns regarding overcrowding and confusion at polling places would not be as much of an issue, if at all, if supervisors implemented the expanded voting hours. <u>Id.</u> at *30.  While the Court acknowledges that many counties are not implementing the full 96-hour voting period, it nevertheless appears that most supervisors are implementing a voting plan in relation to the size of their county.  Thus, the

---

[19] The Court notes that, according to the Notice of County Early Voting Plans (Doc. 33), the supervisors in Hamilton and Lafayette Counties have scheduled only five hours of early voting on Sunday, despite the legal requirement of at least six.  The Court assumes that the Secretary of State will remind these counties of their obligation to follow the new law.

larger urban counties are using the full 96-hour period allowed by the new law, while the smaller rural counties are using fewer hours.[20]  No county has said it will only use the minimum 48 hours allowed by the law.  Thus, the evidence before the Court at this time does not support a finding that the current Early Voting Statute will result in such a substantial increase in lines, crowding and confusion that minority voters will be unequally burdened.[21]

The Court also considers the 2011 Early Voting Statute outside the context of how it compares to the prior Florida statute.  As Plaintiffs conceded at the hearing, there is no fundamental right to early voting.  Indeed, 18 states do not allow early voting at all.  See "Absentee and Early Voting" National Conference of State Legislatures (Doc. 30, App'x V4 at 1427-31; NCSL Report).  Although Florida's eight days of early voting is below the 19-day average across all 32 states, the early voting period in states that do allow it ranges from 4 days to 45 days.  Id.[22]  Moreover, only approximately 12 of the 32 states with early voting "require that early vote centers be open on at least one Saturday or Sunday during the early voting period."  Id.  Other states with early voting also "give county or local officials the authority to determine the hours for early voting."  Id.  Thus, acceptance of Plaintiffs' argument that the eight days of early voting allowed by the Florida legislature violates

---

[20] The Court has taken judicial notice of the 2010 Census figures to determine the populations of Florida's counties.

[21] In setting their hours for the upcoming general election, the Court can only assume that the elections supervisors have considered that there will be a larger turnout and lengthier ballots than in the primary.

[22] Notably, even under the previous early voting law, which Plaintiffs embrace, Florida offered up to 14 days of early voting, still less than the 19-day average.

Section 2 could have far-reaching implications.  Cf. Hood, 351 F. Supp. 2d at 1335-36.  As

explained in Hood:

> [c]onsider the fact that many states do not engage in any form of early voting.
> Following Plaintiffs' theory to its next logical step, it would seem that if a state
> with a higher percentage of registered African-American voters than Florida did
> not implement an early voting program a Section 2 violation would occur
> because African-American voters in that state would have less of an
> opportunity to vote than voters in Florida.  It would also follow that a Section
> 2 violation could occur in Florida if a state with a lower percentage of African-
> American voters employed an early voting system . . . that lasts three weeks
> instead of the two week system currently used in Florida.  This simply cannot
> be the standard for establishing a Section 2 violation.

Id.; see also id. at 1332-33 & n.2.  Rather, the Court must consider whether the State of

Florida, having decided to allow early voting, has adopted early voting procedures that

provide equal access to the polls for all voters in Florida.

Because Florida's Early Voting Statute allows early voting during non-working hours,

as well as voting during the weekend, including one Sunday, voting times which are

important to African American voters, as well as to GOTV efforts, the Court cannot find that

the 2011 Early Voting Statute denies equal access to the polls.[23]  The Court recognizes that

the new law gives the county supervisors limited discretion to set the number of early voting

hours, however, Plaintiffs have provided no evidence to suggest that the supervisors will set

voting hours in a discriminatory manner, nor does the evidence with respect to the early

---

[23] It bears mentioning that "every regulation that creates an election structure will necessarily disenfranchise some voters."  See Hood, 351 F. Supp. 2d at 1332.  "For example, the location of polling places makes it easier for voters who reside closer to that polling place to get there than those who live further away.  Additionally, a decision in Florida to have two weeks of early voting makes it more difficult for Florida voters to vote early than those voters in a state that allows four weeks of early voting."  Id. at 1332 n.2.

31

voting hours already scheduled for the November 6, 2012 Election support such a finding.

Under the totality of the circumstances, the Court cannot conclude that application of the

2011 Early Voting Statute will result in a denial or abridgement of the right to vote on account

of race.[24]  Accordingly, because Plaintiffs can satisfy neither the discriminatory intent nor the

discriminatory results tests, they have failed to show a substantial likelihood of success on

the merits of their Voting Rights Act claim.

### ii.   Constitutional Claims

Plaintiffs alternatively contend that the changes to Florida's Early Voting Statute deny

African Americans equal protection of the laws and deprive African Americans of the right

---

[24] Under <u>Gingles</u>, the Court should consider "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political processes." <u>See</u> <u>Gingles</u>, 478 U.S. at 45.  As such, the Court rejects the Secretary's contention that "inflexible work schedules, disabilities, financial burdens, or limited access to childcare or transportation" are "race-neutral causes wholly unrelated to the challenged law." <u>See</u> Secretary's Response at 18-19.  In doing so, the Court adopts the reasoning used by the <u>Florida</u> court to reject a similar contention.  In <u>Florida</u>, the state made a similar argument, specifically that: "if the retrogression is 'because of' some other factor (e.g., socioeconomic status . . . ) which just happens to be correlated with race, it is not 'because of' race, color, or language minority status . . . ." <u>Florida</u>, 2012 WL 3538298, at *12 (internal quotations omitted).  The <u>Florida</u> court reasoned that:

> This argument . . . would read the effect test out of the statute.  It is difficult to imagine an example of a voting law or practice that would meet such a stringent definition of race-based causation – unless, of course, the law were something so facially discriminatory as "African-Americans may not vote." The Voting Rights Act is plainly not limited to addressing such obvious forms of discrimination.

<u>Id.</u> at *12.  Nevertheless, even considering the social inequities that often make it more difficult for minority voters to access the polls, Plaintiffs fail to demonstrate that Florida's Early Voting Statute allocates days and hours in such a way that results in unequal access to voting on account of race.

to vote on account of race in violation of the Fourteenth and Fifteenth Amendments. <u>See</u> Plaintiffs' Memo at 26.  As Plaintiffs correctly concede, to establish a violation of the Constitution on the basis of racial discrimination, Plaintiffs must demonstrate that the challenged act has "a discriminatory purpose and effect." <u>See</u> Plaintiffs' Memo at 26; <u>see also</u> <u>Burton</u>, 178 F.3d at 1188-89 ("[T]o establish a violation of either the Equal Protection Clause of the Fourteenth Amendment or the Fifteenth Amendment, [plaintiffs] must show that the [defendant's] decision or act had a discriminatory purpose and effect.").  As discussed above, Plaintiffs fail to demonstrate that the Florida legislature amended the Early Voting Statute with a racially discriminatory purpose.  <u>See</u> <u>supra</u> Part IV.A.i.1.  Thus, Plaintiffs cannot demonstrate a substantial likelihood of success on their Fourteenth or Fifteenth Amendment claims.[25]  <u>See</u> <u>Hood</u>, 351 F. Supp. 2d at 1336-37.

### B.      Remaining Factors

Because Plaintiffs have failed to establish a substantial likelihood of success on the merits of their claims, Plaintiffs' request for preliminary injunctive relief is due to be denied and the Court need not consider the remaining factors relevant to the issuance of a preliminary injunction. <u>See</u> <u>id.</u> at 1336.

---

[25] Plaintiffs essentially conceded at the hearing that if the Court did not find a Section 2 violation, the constitutional claims must fail as well, with one exception.  Plaintiffs argued that an Equal Protection argument could still be made on the basis that the number of early voting hours available may vary from county to county.  However, this is not the constitutional claim Plaintiffs allege in the Complaint, nor in their Motion for Preliminary Injunction, and therefore, is not an issue before this Court.

## V.     Conclusion

Upon review of the evidence before the Court and the relevant law, the Court finds that, at this stage in the proceedings, Plaintiffs have failed to demonstrate that they are substantially likely to prove that the 2011 changes to the Early Voting Statute were made with the intent to discriminate against minority voters, or that Florida's current Early Voting Statute operates to deny or abridge African Americans' right to vote on account of their race. Without such a showing, the Court cannot enjoin a statute lawfully enacted by the Florida legislature.  It may be of some comfort to those who view this statute as, at the least, bad policy, to note that a substantial number of Florida's counties, including the vast majority of Florida's most populous counties, plan to implement an early voting plan with the maximum number of hours allowed under the new law, the effect of which, according to the <u>Florida</u> court, is likely to be "nonretrogressive."

It is

**ORDERED:**

1.     Plaintiffs' Motion for Preliminary Injunction (Doc. 15) is **DENIED**.

2.     While the Court denies Plaintiffs' Motion for Preliminary Injunction, this does not necessarily end the lawsuit.  Both parties will have the opportunity to further develop the record, if they so choose.  Accordingly, no later than **December 14, 2012**, the parties are directed to confer and file a joint notice addressing how they intend to proceed with this action, and what case management schedule the Court should implement.

34

**DONE AND ORDERED** at Jacksonville, Florida this 24th day of September, 2012.

_____
TIMOTHY J. CORRIGAN
United States District Judge

Attached Exhibit

meh.
Copies:

Counsel of Record

35